

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| IN RE WORLD ACCEPTANCE CORPORATION DERIVATIVE LITIGATION | Lead Case No. 6:15-cv-02796-MGL <br><br> (Derivative Action) |
| This Document Relates To: <br><br> ALL ACTIONS. | |

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTIONS TO DISMISS
THE VERIFIED AMENDED CONSOLIDATED
DERIVATIVE COMPLAINT**

## I.    INTRODUCTION

Plaintiffs filed this case as a shareholder derivative action. The Court has jurisdiction over the matter under 28 U.S.C. §§ 1331 and 1367(a), as well as Section 26 of the Exchange Act, 15 U.S.C. § 78aa.

Pending before the Court is Defendants James R. Gilreath, Charles D. Way, Ken R. Bramlett, Jr., Scott J. Vassalluzzo, and Darrell E. Whitaker's (Outside Director Defendants) Motion to Dismiss Plaintiffs' Verified Amended Consolidated Derivative Complaint (Amended Complaint) for failure to satisfy the heightened pleading requirements of Rule 23.1 of the Federal Rules of Civil Procedure. ECF No. 60. Defendants A. Alexander McLean III, John L. Calmes, Jr., Kelly M. Malson, Mark C. Roland (Individually Named Defendants, collectively,

Defendants), and Nominal Defendant World Acceptance (World Acceptance or the Company) have filed a motion to dismiss in which they join Outside Director Defendants' Motion to Dismiss. ECF No. 61. Having carefully considered the motions, the response, the replies, the record, and the relevant law, it is the judgment of the Court Defendants' Motions to Dismiss will be granted.

## II.      FACTUAL AND PROCEDRUAL HISTORY

The following facts are taken from Plaintiffs' Amended Complaint, the documents incorporated by reference therein, and public filings of which the Court may take judicial notice. World Acceptance is a small-loan consumer finance business that specializes in sub-subprime lending, offering short-term installment loans to "consumers who have no other place to turn for financial help." ECF No. 55 at 8. The Company's customers "by and large are low-income consumers with bad credit, little educational background, and very limited financial resources." *Id*. at 25. The typical installment loan World Acceptance offers is between $300 and $4,000 in value, and is payable in fully amortizing monthly installments with terms ranging from four to forty-two months. *Id*. at 124. World Acceptance has rapidly expanded over the past decade, and by the end of the 2014 fiscal year, the Company had a loan portfolio in excess of 956,000 loans valued at more than $1.1 billion. *Id.*

Although World Acceptance provides financing that is otherwise unavailable to these borrowers, Plaintiffs assert the financing "amounts to little more than a form of perpetual debt" as a result of exorbitant interest rates, unnecessary credit insurance products frequently forced on the consumer, and the Company's practice of encouraging customers to refinance, or "renew," existing loans. *Id*. at 8-9. Plaintiffs allege World Acceptance aggressively pushed customers to refinance their loans only two or three months into an existing loan, which created the perception

the Company was experiencing rapid growth in loans and loan revenue and helped avoid delinquencies. *Id*. at 32. These "small-dollar loan renewals" occurred whenever a customer took out a "new" loan by refinancing a preexisting loan, at which point the Company marked the old loan as paid in full. *Id*. at 11. Plaintiffs avow Defendants made this calculated perception their "number one priority"; small-dollar loan renewals comprised as much as 75% of the Company's loan portfolio from January 30, 2013–July 15, 2015 (Relevant Period). *Id*. July 15, 2015, is the date Plaintiffs brought this lawsuit. ECF No. 1.

The Company later admitted it had improperly accounted for such loan renewals in direct violation of Generally Accepted Accounting Principles (GAAP). ECF No. 55 at 11. GAAP allows an existing loan to be recapitalized into a "new" loan only if the borrower has repaid at least 10% of the principal. In those instances, the old loan may be recorded as extinguished and a new loan may be recorded in the lender's books. *Id*. In contrast, if a borrower has repaid less than 10% of the principal, the "new" loan must be accounted for as a "modification" of an existing loan—not as a "new" loan. *Id*. The crux of Plaintiffs' allegations are Defendants "failed to disclose, or recklessly disregarded," these faulty accounting practices, which "artificially inflated loan volume and growth during the Relevant Period." *Id*. at 45.

On January 30, 2013, Defendants announced the Company's 2013 third quarter financial results by filing a Form 8-K and a Form 10-Q with the SEC. *Id*. at 45, 48. The press release attached to the filing emphasized the Company's forty-eighth consecutive year-over-year quarterly increase in diluted earnings per share, which the Company attributed primarily to "the increase in average net loans and the associated growth in interest and fees." *Id*. Total revenue increased by 10.1%: from $136 million during the third quarter of the prior year to $149.6 million in the third quarter of 2013, due to loan growth. *Id*. at 46. In a follow-up conference

3

call, Defendant McLean, in responding to a question by a securities analyst, concluded, "I certainly don't believe the outlook for this Company is anything but positive." *Id.* at 47.

According to Plaintiffs' Amended Complaint, certain Defendants assured "the Company's accounting and reporting policies are in accordance with U.S. GAAP and conform to general practices within the finance company industry." *Id.* at 49. Further, the Summary of Quarterly Results also noted:

> An evaluation was carried out under the supervision and with the participation of the Company's management, including its CEO and CFO, of the effectiveness of the Company's disclosure controls and procedures as of December 31, 2012. Based on that evaluation, the Company's management, including the CEO and CFO, has concluded that the Company's disclosure controls and procedures are effective as of December 31, 2012.

*Id.* (internal quotation marks omitted). Defendants McLean and Malson signed certifications required by the Sarbanes-Oxley Act of 2002 (SOX) stating they had reviewed the Form 10-Q and it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made in light of the circumstances under which such statements were made, not misleading with respect to the period covered by that report." *Id.* (internal quotation marks omitted). The market reacted favorably to this report, and the stock price for World Acceptance rose from $75.31 to $77.55 the next day, and eventually up to $78.20 per share on February 8, 2013. *Id.* at 50.

Following the release of the Form 8-K on January 30, 2013, certain Defendants began selling some of their World Acceptance stock over the course of the next two months. *Id.* Defendant Roland sold 7,500 shares at $77.76 per share for total proceeds of $583,193; Defendant Whitaker sold 1,000 shares at $77.76 per share for total proceeds of $77,370; Defendant Vassalluzzo sold or caused to be sold 34,477 shares at $78.77 per share for total

proceeds of $2,715,792; and Defendant and CEO McLean sold 25,000 shares at prices ranging from $79.01 to $79.55 per share for total proceeds of $1,978,499. *Id.*

On April 25, 2013, World Acceptance announced its fourth quarter and fiscal year 2013 financial results, which closely resembled the prior announcement, including continued growth in total revenue, average net loans, and loan volume. *Id.* at 52. During a conference call that same day, several analysts asked questions regarding the effects of state and federal regulation on the Company's refinancings. *Id.* When asked what percentage of new loans written were refinancings of prior outstanding loans, Defendant McLean responded, "If you base it on loan volume, 77% of our loan volume represents renewals of existing loans." *Id.* at 54.

Following the announcement on April 25, 2013, Defendants Roland and Vassalluzzo sold more stock. *Id.* at 55. On May 6 and May 8, 2013, Defendant Vassalluzzo sold 214,218 shares of Company stock at prices ranging from $91.08 to $92.93 per share for total proceeds of $19,863,245; on May 22, 2013, Defendant Roland sold 1,758 shares at $88.76 per share for total proceeds of $156,044. *Id.*

The Company released its fourth quarter and fiscal year 2013 financial results in its 2013 Form 10-K, initially filed with SEC on June 14, 2013, and amended July 19, 2013. *Id.* In its Form 10-K, World Acceptance claimed to adhere to stringent underwriting practices for its installment loans, and the Company admitted to "actively" marketing the opportunity for qualifying customers to refinance existing loans prior to maturity. *Id.* The Form 10-K reiterated the Company's adherence to GAAP and contained similar SOX certifications. *Id.* at 58. Both the fiscal 2013 Form 10-K and the 2013 amended Form 10-K were signed by, among others, Defendants McLean, Whitaker, Vassalluzzo, Way, Bramlett, and Gilreath. *Id.* at 59.

5

Plaintiffs advance the truth about the Company's allegedly illicit lending practices began to emerge when World Acceptance filed Form NT 10-K/A with the SEC on July 3, 2013, disclosing "the Company was unable to file a completed Form 10-K for the fiscal year ended March 31, 2013, 'because of unexpected delays' relating to the need for an 'additional review and analysis' of the Company's allowance for loan losses." *Id*. at 12.  The Company disclosed it was "possible that the Company's amended Form 10-K [would] report a material weakness in its internal control over financial reporting relating to its process for determining its allowance for loan losses." *Id*. (emphasis omitted).  After these announcements, the Company's stock price fell more than 12% the next trading day.  *Id*.

On July 25, 2013, Defendant McLean, on behalf of World Acceptance, explained the Public Company Accounting Oversight Board (PCAOB), during an audit of the Company's independent auditor KPMG, discovered a "material weakness" in World Acceptance's accounting treatment of small-dollar loan renewals as a result of loans improperly being recorded as "renewals" instead of "modifications."  *Id*. at 64.  Specifically, "it was determined that the Company did not have a control to assess less than 10% renewals and had difficulty proving that they did not materially affect the allowance."  *Id*. at 61. As Defendant McLean later admitted during an April 29, 2014, conference call, the Company "was not properly accounting for those loans with proceeds of less than 10%." *Id*. at 35.

Despite the amended 10-K and admitted material weakness, Defendant McLean, during his conference call with analysts, said, "I do not believe that it will represent a material impact on our operations or results." *Id*. at 62.  Defendant McLean confirmed to analysts the Company already possessed the data necessary for proper accounting, and provided further assurances "this situation is well under control." *Id*. at 64.

Although the Company's share price fell 4.3%, Plaintiffs claim the drop would have been much greater had Defendants not (a) downplayed numerous analysts' inquiries, (b) falsely reassured shareholders the "material weakness" would not have a significant impact on the overall operations of the Company moving forward, and (c) not simultaneously disclosed generally positive news regarding the Company's "record financial results" for the first quarter of fiscal year 2014.  *Id*. at 70.

On August 14, 2013, after the stock price had begun to recover from the Company's announcement regarding its internal accounting controls, Defendant Way sold 6,000 shares of World Acceptance stock at $86.54 per share for total proceeds of $519,240; on August 20, 2013, Defendant Bramlett sold 3,000 shares at $88.41 per share for total proceeds of $265,230.  *Id*. at 68.  On September 10, 2013, the Company announced its Chief Financial Officer and Senior Vice President, Defendant Malson, would retire.  *Id*. at 19.  On November 4, 2013, the Company announced its Chief Operating Officer and President, Defendant Roland, was resigning for "personal reasons."  *Id*.  According to Plaintiffs, this pattern of reporting loan and revenue growth, continuing inflation of the Company's stock price, and subsequent selling of stock by Defendants continued through the second and third quarters of fiscal year 2014.  *Id*. at 68-75.

On March 12, 2014, the Consumer Financial Protection Bureau (CFPB) served World Acceptance with a Civil Investigative Demand (CID) related to the Company's lending practices.  *Id*. at 43.  The Company publicly disclosed this event by filing a Form 8-K with the SEC.  *Id*.  According to the Form 8-K, the CID stated the CFPB was investigating:

> (i) to determine whether finance companies or other unnamed persons have been or are engaging in unlawful acts or practices in connection with marketing, offering, or extension of credit in violation of Sections 1031 and 1036 of the Consumer Financial Protection Act, 12 U.S.C. §§ 5531, 5536, the Truth in Lending Act, 15 U.S.C. §§ 1601. et seq., Regulation Z, 12 C.F.R. pt. 1026, or any

other Federal consumer financial law and (ii) to determine whether Bureau action to obtain legal or equitable relief would be in the public interest.

*Id*. Following this disclosure, the Company's stock fell almost 20%. *Id*.

On April 29, 2014, Plaintiffs aver Defendants caused the Company to issue World Acceptance's fourth quarter 2014 financial results, which were filed with the SEC in Form 8-K. *Id*. at 76, 79. World Acceptance announced in the Form 8-K it had made some "system changes that ensured customers were not encouraged to refinance existing loans where the proceeds from the transaction were less than 10% of the loan being refinanced." *Id*. at 77. The Company acknowledged "this resulted in a decrease in our loan volume and had an impact on our balances outstanding and our overall yields." *Id*. Following the announcement of the "system changes," the Company experienced its lowest quarterly growth in nine years. *Id*. at 78.

Defendants incorporated the Company's fourth quarter and full year financial results into its fiscal 2014 Form 10-K, which was filed with the SEC on June 12, 2014. *Id*. at 79. The 2014 Form 10-K contained "substantially similar statements as those in the Company's fiscal 2013 Form 10-K," including similar SOX certifications and an emphasis on adhering to GAAP. *Id*. The "system changes" had a significant, negative impact on the Company's shareholders. When an analyst inquired as to the percent of originations that came from sub-10% renewals before and after the changes were implemented, Defendant McLean responded, "It's dropped down to the 7% or 8% range from the 20% range that we announced last year. So it's dropped down dramatically." *Id*. Regarding the ongoing CFPB investigation, the Company stated in the Form 10-K,

While the Company believes its marketing and lending practices are lawful, there can be no assurance that CFPB's ongoing investigation or future exercise of its enforcement, regulatory, discretionary, or other powers will not result in findings or alleged violations of federal consumer financial protection laws that could lead to enforcement actions, proceedings, or litigation and the imposition of damages,

> fines, penalties, restitution, other monetary liabilities, sanctions, settlements, or changes to the Company's business practices or operations that could have a material adverse effect on the Company's business, financial condition or results of operations or eliminate altogether the Company's ability operate its business profitably or on terms substantially similar to those on which it currently operates.

*Id*. (emphasis omitted).

According to the Company's 2013, 2014, and 2015 Proxy Statements, the Board, including six Defendants, "received communications on the most important strategic issues and risks facing the Company" and received "regular reports from the Company's Chief Executive Officer or other senior managers regarding compliance with applicable risk-related policies, procedures, and limits." *Id*. at 37.

Plaintiffs aver Defendants mitigated the impact of fourth quarter and fiscal year 2014 financial results by emphasizing gross loan receivables, net income and interest, and fee income while "failing to disclose that these improved results were the result of continued improper lending practices." *Id*. at 82. Plaintiffs further allege, although the Company's stock was still "artificially inflated," on May 22, 2014, Defendant McLean sold 4,995 shares of World Acceptance stock at $80.00 per share for proceeds of $399,600. *Id*. The next month, on a conference call, Defendant McLean responded to an analyst's request for an update on the CID by stating, "We really don't believe that we are doing anything wrong and it would be very nice if they would finish their review within the six months and go onto a different project." *Id*. at 84.

On September 5, 2014, the Company announced KPMG, after serving as World Acceptance's independent auditor for the past twenty years, had resigned. The Company's stock price fell approximately 7.5% the next trading day. *Id*. at 15. On October 22, 2014, Plaintiffs avouch Defendants caused World Acceptance to announce its second quarter 2015 financial results via a Form 8-K filed with the SEC. *Id*. at 85. During the Company's quarterly analyst

9

call, Plaintiffs contend Defendant McLean reaffirmed Defendants' delays in implementing proper internal controls, stating, "I believe the impact of the changes we had surrounding the less-than-10% renewables will be lessened over the next couple of months because of the implementation date of that back in February [2014]." *Id*. at 88 (emphasis omitted).

On June 2, 2015, the Company announced Defendant McLean's retirement, and its stock price dropped approximately 5%. *Id* at 15. On August 10, 2015, the Company announced it had received a Notice of Opportunity to Respond and Advise (NORA) letter from the CFPB on August 7, 2015, notifying the Company CFPB's Enforcement Office "is considering recommending that the CFPB take legal action against the Company." *Id*. The Company's stock price dropped over 34% the following day, from a close of $51.80 on August 10 to a close of $34.00 on August 11. *Id*. During the Relevant Period, the Company's market capitalization decreased by approximately 60%, or approximately $420 million. *Id*.

When Plaintiffs filed their Amended Complaint, ECF No. 55, there were seven members of the Company's Board: Defendants McLean, Whitaker, Vassalluzzo, Way, Bramlett, Gilreath and non-defendant Janet Lewis Matricciani. *Id*. at 168. In lieu of filing an Answer, Outside Director Defendants filed a Motion to Dismiss, ECF No. 60, which Defendants Calmes, Malson, McLean, Roland, and Nominal Defendant World Acceptance joined, ECF No. 61. Plaintiffs filed a response in opposition, ECF No. 63, and Outside Director Defendants filed their reply, ECF No. 65, which Defendants Calmes, Malson, McLean, Roland, and Nominal Defendant World Acceptance joined, ECF No. 66.

The Court, having been fully briefed on the relevant issues, will now consider the merits of the two motions.

10

### III.    STANDARD OF REVIEW

Outside Director Defendants, joined by Defendants McLean, Calmes, Malson, Roland, and Nominal Defendant World Acceptance Corporation, move to dismiss all claims by Plaintiffs for failure to satisfy the heightened standards for pleading demand futility required by Fed. R. Civ. P. 23.1.  ECF Nos. 60-61.  "The authority to direct the business and affairs of a corporation is delegated to a board of directors, not the shareholders."  *Carolina First Corp. v. Whittle*, 539 S.E.2d 402, 407 (S.C. Ct. App. 2000).  "A derivative action is, in essence, a challenge to the board's managerial authority."  *Id.* at 408.  Accordingly, when a derivative plaintiff seeks to usurp the board's authority to decide whether the corporation should pursue legal claims, the plaintiff must meet a significantly heightened pleading standard.

Rule 23.1(b), which governs the pleading requirements in derivative actions, states the plaintiff's verified complaint must:

> (1) [A]llege that the plaintiff was a shareholder or member at the time of the transaction complained of . . .;  (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b).

Thus, as a precondition for bringing a derivative action, the plaintiff "must make a demand on the board which the board refused or allege facts sufficient to show that demand would have been futile."  *Whittle*, 539 S.E.2d at 402.  "To the extent that a jurisdiction recognizes the futility exception, the jurisdiction places a *limit* upon the directors' usual power to control the initiation of corporate litigation."  *Kamen v. Kemper Fin. Serv. Inc.*, 500 U.S. 90, 101 (1991).  "A court entertaining a derivative action . . . must apply the demand futility exception as

it is defined by the law of the State of incorporation." *Id.* at 108-09. Due to the voluminous body of Delaware corporate law, the South Carolina Supreme Court and Court of Appeals have indicated Delaware law is persuasive in assessing demand futility. *See, e.g.*, *Whittle*, 343 S.C. at 187-88 (noting South Carolina has adopted Fed. R. Civ. P. 23.1(b) procedurally, but applying Delaware law in analyzing demand futility). There are two tests for determining demand futility under Delaware law; the applicable test depends on the type of claim the plaintiffs assert.

      *A.*    **Rales** *Test*

If a plaintiff challenges the board's failure to act, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

A director is considered interested where "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Id*. at 936. A plaintiff can also establish a director is interested by alleging conduct "so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of [personal] director liability therefore exists[.]" *In re Citigroup S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009). This is so because there is "presumptively a reason to doubt that a director who faces a substantial likelihood of personal liability could be disinterested when responding to a demand." *Id*.

"When the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading

permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption." *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995).

To establish lack of independence, a plaintiff must "show that the directors are 'beholden' to [the alleged controlling person] or so under their influence that their discretion would be sterilized." *Rales*, 634 A.2d at 936 (quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)). "A plaintiff charging domination and control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'" *Aronson*, 473 A.2d at 816 (quoting *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971)).

### B.    Aronson *Test*

If the plaintiff challenges a specific board decision, the court must determine "whether, under the particularized facts alleged, a reasonable doubt is created that a majority of the directors: (1) are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id*. at 812. The prongs of the *Aronson* test are in the disjunctive; therefore, if plaintiff creates a reasonable doubt as to either prong of the test, demand is excused. *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

## IV.    DISCUSSION AND ANALYSIS

Regardless of the applicable test, "futility is gauged by the circumstances existing at the commencement of the derivative suit." *Id*. at 810. When evaluating demand futility, "Plaintiffs

13

are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences," and will not be taken as true. *Brehm*, 746 A.2d at 255.

In deciding a motion to dismiss, the Court may take judicial notice of an exculpatory provision in a corporation's certificate of incorporation. *See Baxter*, 654 A.2d at 1269. World Acceptance's certificate of incorporation contains a provision exempting the Company's Directors from personal monetary liability for alleged negligence in carrying out their fiduciary duties. ECF No. 60-3 ¶ 4(c). "When the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption." *Baxter*, 654 A.2d at 1270. Conduct that falls outside of the exemption includes "bad faith, intentional misconduct, knowing violation of law, or any other conduct for which the directors may be liable." *Id*.

A.  ***Counts I-III: Misleading Information, Failure to Monitor, and Failure of Oversight Claims***

In Counts I, II, and III, Plaintiffs charge Defendants with breaching their fiduciary duties by disseminating false and misleading information to shareholders (Count I), failing to maintain internal controls (Count II), and failing to oversee and manage the Company (Count III). These claims are not challenging a specific Board decision, and are therefore subject to the *Rales* test. *See Stone ex rel. Amsouth Bancorporation v. Ritter*, 911 A.2d 363, 367 (Del. 2006) (applying the *Rales* test to failure of oversight claims). "Director liability based on the duty of oversight is possibly the most difficult theory in corporate law upon which a plaintiff may hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). "Only a sustained or systemic failure of a board to exercise oversight – such as an utter failure to

14

attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." *Id.* at 971.

The preceding quotation from the court in *Caremark* "draws heavily upon the concept of director failure to act in good faith." *Stone*, 911 A.2d at 369. "A failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." *Id.* The Delaware Supreme Court in *Walt Disney* proceeded to give the following examples of conduct constituting a failure to act in good faith:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). "The fiduciary duty violated by that conduct is the duty of loyalty," rather than the duty of care. *Stone*, 911 A.2d at 370. Thus, "*Caremark* articulates the necessary conditions predicate" for director oversight liability: a plaintiff must plead particularized facts showing (1) "the directors knew they were not discharging their fiduciary obligations" or (2) "demonstrated a conscious disregard for their responsibilities such as by failing to act in the face of a known duty to act." *Id.* "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Id.* It is within this framework the Court must analyze Counts I-III of Plaintiffs' Amended Complaint.

Defendants stress Counts I-III are classic *Caremark* claims, and Plaintiffs have failed to allege particularized facts sufficient to create a reasonable doubt the Directors

were presented with warning signs or red flags notifying them of a system failure, much less allege particularized facts sufficient to create a reasonable doubt a majority of the Directors ignored them.

Plaintiffs contend these claims are not "failure of oversight" claims encompassed under the duty of care, but rather these claims are what Plaintiffs mistakenly refer to as a "good faith claims," which *Stone* clarifies are actually claims alleging a breach of the duty of loyalty. Plaintiffs aver the Board knew of the mischaracterization of loan modifications as renewals because that was the Company's business plan and further failed to make a good faith effort to prevent or remedy the accounting issues. Despite the array of conclusory allegations in Plaintiffs' Amended Complaint, the Court holds Plaintiffs have failed to adequately plead particularized facts sufficient to create a reasonable doubt as to whether a majority of the Company's Board was incapable of considering a demand with respect to the failure of oversight claims alleged in Counts I-III.

> 1. *Count 1: Disseminating False and Misleading Information to Shareholders Claim*

Plaintiffs' Amended Complaint contains no particularized facts suggesting a majority of the Board was ever alerted to, but ignored, the internal control issue relating to accounting for sub-10% renewals. In the years preceding the PCAOB's identification of the "material weakness" related to accounting for the sub-10% renewals, the Company's independent auditor, KPMG, opined in the Company's 2012 SEC Form 10-K the Company's internal controls over financial reporting were effective and the Company's financial statements were presented in accordance with GAAP.

The Company's Directors were entitled to rely on the opinions of its outside auditor, KPMG, and its assessment the Company's financial accounting conformed with GAAP. *See* S.C. Code Ann. § 33-8-300(b) (noting "a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by . . . public accountants, or other persons as to matters the director reasonably believes are within the person's professional or expert competence"); *see also In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 781 (Del. Ch. 2009) (noting "in corporate law, independent directors are entitled to rely in good faith on advice from auditors that corporate books and records are accurate and GAAP-compliant and that corporate internal [sic] controls are adequate"). Plaintiffs acknowledge the inadequate internal controls at issue in this case became known only after the PCAOB, who is the auditor of the Company's auditor, identified the problem during a review of KPMG.

In that regard, the Amended Complaint recognizes (i) KPMG, the Company's outside auditor, did not identify the issue and previously issued clean audit opinions before the PCAOB identified it, (ii) the Company had announced the internal control issue regarding sub-10% renewals had no material impact on the Company's previously reported financial results such that it was not required to restate them.

The Amended Complaint also includes allegations concerning the knowledge of the Audit Committee Directors: Defendants Way, Bramlett, and Whitaker. Plaintiffs propound these three Audit Committee Directors, all of whom are Outside Directors who have never been employed by the Company, breached their fiduciary duty of loyalty by repeatedly allowing or permitting the dissemination of false and misleading statements,

which caused the Company to fail to comply with applicable regulations in contravention of GAAP.  However, as Defendants correctly point out, Plaintiffs' recitation of the Audit Committee's enumerated responsibilities is no substitute for the particularized facts "that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them, or, even worse, to encourage their continuation."  *Guttman*, 823 A.2d at 507.

Plaintiffs allege the PCAOB had previously questioned whether the Company's loan accounting documentation was satisfactory and implied, if the documentation was unsatisfactory, multiple audits would have to be conducted.  However, as Plaintiffs note in the Amended Complaint, the PCAOB reviewed the Company's audits several years before the current internal control issue was identified and determined the Company's loan accounting documentation was proper at that time. When the internal control issue was later identified, the Company reported it and began implementing policies and procedures to remediate the problem.

Plaintiffs declare an article published in *Propublica* regarding the Company's lending practices was sufficient to raise a red flag and put the entire Board on notice of potential illicit lending practices.  However, a red flag must "raise obvious danger signs of employee wrongdoing," and the article upon which Plaintiffs rely does not conclude the Company has engaged in any wrongful conduct.  *See Baxter*, 654 A.2d at 1270. Additionally, Plaintiffs refrain from alleging the Company has violated any laws; instead they primarily rely on the CFPB investigation as evidence of wrongdoing.  The Court is unpersuaded by Plaintiffs' contentions because the operative date for determining demand futility, the date the lawsuit commenced on July 15, 2015, prevents the Court

from considering a significant portion of the CFPB investigation, and more importantly, the CFPB has yet to determine the Company has engaged in any wrongful conduct.

Therefore, the Court holds Plaintiffs have failed to meet the exacting pleading standard required by Fed. R. Civ. P. 23.1(b) and *Rales* to show the Company's Directors face a substantial likelihood of liability for failing to properly oversee World's operations. As such, Defendants' motions to dismiss on this issue will be granted.

### 2. *Count 2: Failure to Maintain Internal Controls Claim*

Plaintiffs repeat many of the conclusory allegations included in Count I in alleging a majority of the Company's Directors face a substantial likelihood of liability for failing to implement appropriate internal controls. A claim predicating director liability on a failure to implement or maintain internal controls is the quintessential *Caremark* claim, and, absent bad faith, liability generally exists only when there is an "utter failure to attempt to assure a reasonable information and reporting system exists." *Stone*, 911 A.2d at 369. "A demanding test of liability in the oversight context is probably beneficial to stockholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to good faith performance of duty by such directors." *Caremark*, 698 A.2d at 971.

Plaintiffs contend the Board was put on notice of the Company's unlawful conduct and improper loan growth, and therefore was required to exercise good faith in taking appropriate action to correct the misconduct. Plaintiffs further allege Defendants willfully ignored the obvious problems with World Acceptance's internal control practices, and that each of Defendants had knowledge of and actively participated in,

approved of, or acquiesced to the wrongdoings. The Court holds Plaintiffs' conclusory allegations are totally devoid of the particularized facts required by *Rales* and *Caremark*.

Plaintiffs' Amended Complaint acknowledges the Company has an Audit Committee charged with overseeing the integrity of the Company's internal control system, overseeing the audit performance of the Company's independent accountants, and facilitating communication between the Board, senior management, and the independent accountants. The Amended Complaint further recognizes the Audit Committee's creation of the Company's Compliance Management System (CMS) to ensure compliance with applicable consumer financial laws. In addition, the Company's Board created the position of Chief Compliance Officer to oversee CMS. Plaintiffs' argument a majority of the Company's Board faces a substantial likelihood of liability for failing to implement internal controls lacks sufficient factual support. Accordingly, Defendants' motions to dismiss Count II for failure to make a demand will be granted.

### 3. *Count 3: Failure to Oversee and Manage the Company Claim*

Plaintiffs' final *Caremark* claim accuses the Defendants of breaching their fiduciary duty to oversee and manage the Company. Plaintiffs posit Defendants breached their duty of oversight and supervision by willfully or in bad faith allowing Company officers or other employees to conduct the Company's operations in violation of applicable laws and regulations, resulting in the Company sustaining significant damages. The fatal problem with Plaintiffs' claim is their failure to allege particularized facts supporting these allegations.

Plaintiffs' conclusory allegations, without more, are insufficient to withstand scrutiny under *Rales* and *Caremark*. "No rationally designed information and reporting

system will remove the possibility the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law." *Caremark*, 698 A.2d at 970.  Where, as here, the corporation has in place a set of internal controls, director oversight liability only exists if the directors "consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone*, 911 A.2d at 370.  Plaintiffs' argument fails as they have neglected to plead the particularized facts necessary for a finding of director liability.  Accordingly, Defendants' motions to dismiss Count III for failure to make a demand will be granted.

### B.    Counts IV and VI: Unjust Enrichment and Insider Trading Claims

Plaintiffs' unjust enrichment (Count IV) and breach of fiduciary duty for insider selling (Count VI) claims do not challenge a specific Board decision and thus are subject to the *Rales* test.  *See Guttman*, 823 A.2d at 503.  A valid claim for insider selling also states a claim for unjust enrichment.  *See id.* )) (noting "directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits" (*citing Brophy v. Cities Serv. Co.*, 70 A.2d 5 (1949))).  "A director is not 'interested' whenever a derivative plaintiff cursorily alleges he made sales of company stock in the market at a time when he possessed material, non-public information."  *Id.* at 502.  Plaintiffs must show "each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information."  *Id.*

A non-exhaustive list of factors to consider in determining whether a plaintiff has made this showing includes the roles played by each director at the company, the

information that would have come to their attention, what indication there was directors would have known of information leading them to believe the stock was allegedly overpriced, when the trades occurred, and the percentage of stock sold compared to the total amount owned. *Id*. at 503-05.

Plaintiffs attempt to distinguish *Guttman* on the grounds it involved a highly technical, obscure accounting issue that ultimately led the company to restate its historical financial results. Plaintiffs allege this case is based on allegations the Directors sold stock on the basis of their knowledge of a company's non-public, adverse, "core informational" and illegal business strategy. Plaintiffs, however, have yet to identify anything about the Company's operations that has been determined to be illegal, and there are no particularized facts to indicate whether the remaining conclusory allegations are true. Further, this case is also about an accounting issue that was by any measure an obscure one.

Plaintiffs fail to address any of the *Guttman* factors despite Defendants' particularized explanation of the trades. Specifically, two Outside Directors, Bramlett and Way, increased the number of shares held by them during the Relevant Period; Outside Director Gilreath retained 97% of his pre-exercise holdings of Company stock; Outside Director Whitaker sold 12% of his total holdings; and these sales spanned from February 7, 2013, to December 3, 2014. These facts appear to the Court to decrease the likelihood Outside Directors traded on "inside information." Plaintiffs' limited factual allegations suggest the opposite finding, as each stock sale identified in the Amended Complaint occurred after World issued public reports of quarterly earnings.

Instead, Plaintiffs rely heavily on this Court's ruling in the Securities Class Action, *Epstein v. World Acceptance*, No. 6:14-1606-MGL, 2015 WL 2365701 (D.S.C. May 18, 2015) (*Epstein*), in which this Court held Defendant McLean and other executives not named in this action possessed material non-public information and acted with scienter to manipulate the "flow of information" into the market. Plaintiffs insist this finding supports a similar finding in this case because Board members had access to the same information about the Company's core operations, and Defendants Vassalluzzo, Way, Bramlett, and Gilreath each sold Company stock during that time. Plaintiffs charge these allegations alone excuse demand.

Plaintiffs' reliance on *Epstein* is fundamentally misguided. In that case, this Court held executives who were employees of the Company possessed material non-public information; in the instant case, the majority of the Board consists of Outside Directors who are not, and have never been, employed by the Company. *See Guttman*, 823 A.2d at 504 (noting presence of securities suit did not give rise to substantial likelihood of liability on the part of a majority of the board where five of seven directors were not defendants in the securities suit). Accordingly, Defendants' motions to dismiss Counts IV and VI for failure to make a demand will be granted.

### C.     *Counts V and VII: Claims Connected to McLean's Retirement*

Counts V and VII challenge specific Board decisions concerning Defendant McLean's retirement and the repurchase of shares of the Company's stock. Plaintiffs avow demand was excused for Count V because the Directors "wasted" corporate assets by (1) overcompensating Officers and Directors, and (2) authorizing and effectuating a stock buyback plan.

When a plaintiff challenges a specific decision made by the board, a plaintiff must allege particularized facts showing: (i) a majority of the Board was interested in the matter or lacked independence from some interested Director, or (ii) the challenged transaction or decision was not the product of a valid exercise of business judgment. *See Aronson*, 473 A.2d at 814. "The business judgment rule precludes judicial review of actions taken by a corporate governing body absent a showing of a lack of good faith, fraud, self-dealing, or unconscionable conduct." *Dockside Ass'n, Inc. v. Detyens*, 362 S.E.2d 874, 874 (S.C. 1987). This Court, after all, does not sit as some sort of Super Board second-guessing a board of directors absent a showing of some sort of nefarious conduct by the board members.

Plaintiffs do not challenge the independence of the Board in this claim. Therefore, they must (1) plead particularized facts demonstrating a majority of the directors face a substantial threat of personal liability for allegedly committing corporate waste, or (2) plead particularized facts to overcome the presumption the allegedly "wasteful" decisions are protected by the business judgment rule.

Plaintiffs' failure to plead particularized facts is once again fatal. A "plaintiff must generally show that the board irrationally squandered corporate assets—for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all." *White v. Panic*, 783 A.2d 543, 554 (Del. 2001). Plaintiffs fail to allege any particularized facts supporting an inference the challenged compensation, bonuses, and severance served no corporate purpose or involved no consideration at all to the Company. With regard to compensation, directors

have a "broad corporate power to fix the compensation of officers." *Aronson*, 473 A.2d at 817.

Plaintiffs' allegations regarding the Company's stock repurchasing program are likewise unpersuasive because there are no particularized facts supporting the allegation the Company's stock price was trading at an artificially inflated value. For the same reasons Plaintiffs fail to meet the first prong of the *Aronson* test, Plaintiffs also fail to satisfy the second prong. There are no particularized allegations creating a reasonable doubt the compensation plans or stock repurchase plans were "irrational," the result of "fraud," "self-dealing" or "unconscionable conduct." Accordingly, Defendants' Motion to Dismiss Count V for failure to make a demand will be granted.

The Court will dismiss Count VII as a matter of law because Plaintiffs' claim challenging McLean's retirement cannot serve as a basis to excuse demand because the underlying facts occurred after this action was filed on July 15, 2015. *See, e.g.*, *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 621 (6th Cir. 2008) (collecting cases and noting demand is not excused where plaintiffs' allegations related to conduct that occurred after filing the original complaint).

### D.    Counts VIII and IX: Securities Claims

Plaintiffs advance two additional claims based on the same facts underlying the *Caremark* claims in Part A. Count VIII and Count IX are both subject to the *Rales* test because they do not challenge a specific Board decision. *See Rales*, 634 A.2d at 927; *see also Guttman*, 823 A.2d at 500. To state a claim under § 10(b), a plaintiff must allege a majority of the board acted with scienter. Scienter can be defined as an intent to deceive

or severe recklessness. *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003).

Plaintiffs state Defendants McLean, Whitaker, Vassalluzzo, Way, Bramlett, and Gilreath face a substantial likelihood of liability because they signed (1) the 2013 Form 10-K and 2013 Amended Form 10-K; (2) the 2014 Form 10-K; and (3) the 2015 Form 10-K. In support of this allegation, Plaintiffs point Epstein, in which this Court held the plaintiffs in that case had adequately met their burden by demonstrating the statements contained in these same documents were false and misleading.

As the Court has already discussed, the Amended Complaint contains no particularized facts suggesting a majority of the Board was ever alerted to any improper accounting practices or any allegedly improper lending practices that were occurring at the Company. There are also no particularized facts in the Amended Complaint to support a holding a majority of the Board acted with scienter, as required by § 10(b).

Plaintiffs' § 14(a) claim fails for slightly different reasons. Section 14(a) prohibits a corporation from issuing a proxy "containing any statement which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 383 (1970). Plaintiffs avouch Defendants made actionable, material omissions in connection with World Acceptance's 2013, 2014, and 2015 Proxy Statements. This argument is without merit for several reasons.

First, Plaintiffs never explain how any alleged "failure" to disclose the Company's accounting for sub-10% renewals was materially misleading to investors. In fact, the Company and its independent auditor, KPMG, concluded the accounting

26

practices did not result in any material inaccuracies in the Company's reported financial results. Additionally, Plaintiffs fail to specify which statements in the Company's proxies they contend were rendered false or misleading because of any such alleged omission. Finally, Plaintiffs have failed to adequately allege the challenged proxies, as opposed to any alleged defect therein, were an "essential link" in a transaction causing injury to World. *See Mills*, 396 U.S. at 384-85. For the above reasons, as well as those stated in Part A above, Defendants' motions to dismiss Counts VIII and IX for failure to make a demand will be granted.

## V.    CONCLUSION

Wherefore, based on the foregoing discussion and analysis, it is the judgment of this Court Defendants' Motions to Dismiss Plaintiffs' Amended Complaint are **GRANTED**.

**IT IS SO ORDERED.**

Signed this 28th day of February, 20176, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE